UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

**ROBERT AND BOBBIE KUCHAREK,**

      Plaintiffs,

**v.**                                       **CIVIL ACTION NO. 3:12-CV-77**
                                                   **(JUDGE GROH)**

**DAN RYAN BUILDERS, INC., and
JOHN DOE, A/K/A "BEAR" as an
individual and as supervisor for
DAN RYAN BUILDERS, INC.,**

      Defendants.

## ORDER GRANTING DEFENDANT DAN RYAN BUILDERS, INC.'S MOTION TO COMPEL ARBITRATION

On March 12, 2013, Defendant Dan Ryan Builders, Inc. ("DRB") filed a Motion to Compel Arbitration [Doc. 14]. On March 26, 2013, Plaintiffs filed their response in opposition to DRB's motion. On April 3, 2013, DRB filed its reply. On May 29, 2013, the Court held an evidentiary hearing in this matter to hear the parties' arguments, listen to testimony, and receive evidence. For the following reasons, the Court finds that Defendant DRB's Motion to Compel Arbitration should be granted.

### I. Facts and Procedural History

The Court finds the following facts based upon the evidence and testimony presented at the final hearing.

Plaintiffs are a married couple residing in Hedgesville, West Virginia. Mr. Kucharek graduated from high school. He has completed some higher education, including courses pertaining to the automotive industry and automotive technology. He

has worked as an automotive mechanic his whole life.  He was a master mechanic, and he specialized in electronics and computer repairs for automobiles.  For twenty three years, Mr. Kucharek worked as an automotive mechanic for *The Baltimore Sun*'s fleet of vehicles.  He also assisted with teaching at Catonsville Community College.  His last job was at Pep Boys, and he worked for two years in their garage.  In 1999, Mr. Kucharek retired from his career in the automotive industry.

Mrs. Kucharek received her G.E.D.[1]  Mr. Kucharek testified that his wife received no higher education.  She was formerly employed by Sitech Industries , and she worked for them for twenty years in their data processing and computer operation department.  She currently works for the Macy's warehouse in Berkeley County.  In her current employment, Mrs. Kucharek scans items and fulfills orders.

Mr. and Mrs. Kucharek began searching for a home in Berkeley County, West Virginia after their close friends moved to the area.  Initially, Plaintiffs contacted a realtor because they thought about purchasing existing construction.  After Plaintiffs did not find anything on the market that they liked, they turned to finding a builder to construct their new home.  Plaintiffs explored the area, and they drove to Berkeley County to view various subdivisions.  During this period of time, Plaintiffs viewed a DRB subdivision, Georgetown Orchard, and viewed the S&A Homes' subdivision directly across the road from the DRB subdivision.

Plaintiffs visited the S&A Homes' model.  They spoke with S&A Homes' sales

---

[1] Mrs. Kucharek did not testify at the hearing.  Therefore, any information regarding Mrs. Kucharek's education and training background as well as her understanding of the contract at issue was provided by her husband, Mr. Kucharek.

representatives.  Additionally, Mr. Kucharek testified that he actually liked what S&A Homes offered a little bit more than what DRB offered.  However, the S&A Homes' subdivision was close to railroad tracks and a private airport.  Therefore, Plaintiffs settled on the DRB subdivision.

Prior to entering into a contract with DRB, Mr. Kucharek testified that they visited the subdivision two times.  On the first visit, Plaintiffs viewed the lots in the subdivision.  Plaintiffs made a list of three lots that could be a possibility.  Then, Plaintiffs met with the DRB sales representative to discuss what lots were available.  At that point, only one lot on their list, Lot 20, was available.  Mr. Kucharek testified that a few days later, DRB's sales representative called Mr. Kucharek to notify him that other people were interested in Lot 20.  After being notified that others were interested in Lot 20, Plaintiffs made an appointment to meet with DRB's sales representatives and sign the contract.

On February 24, 2006, Plaintiffs met with DRB's sales representative in the sales trailer.  Mr. Kucharek testified that the meeting was on a Sunday and the sales representative arrived late.  He stated that it felt like the sales representative was in a hurry.  He also testified that, although he did not have any specific recollection of the meeting, he believed it did not take very long to review the contract.  He estimated that it took about thirty minutes to select the options and sign the contract.  At the meeting, Plaintiffs signed the contract and paid the initial deposit of $6,000.  Mr. Kucharek testified that he had no budget for the purchase of the home, and he was not financing the home.  Instead, Mr. Kucharek was paying with funds from his savings and proceeds from the sale of Plaintiffs' prior home in Maryland.  The base price of the home, with all of the options, was $370,000.  However, Mr. Kucharek admitted that he negotiated the

base price down to pay $355,000.

Mr. Kucharek testified that at the meeting on February 24, 2006, Plaintiffs selected the style of their home, the Poplar.  Plaintiffs also selected certain items and colors.  Plaintiffs selected Berber carpet, the color of the tile, hardwood floors, and upgraded cabinetry.  Mr. Kucharek testified that when purchasing a new home, he realized that builders inflated the price of "upgrades" far beyond what they should be. As a result, Plaintiffs were only interested in structural upgrades.  After making the initial selections, Plaintiffs at some point signed the contract.  Initially, Mr. Kucharek testified that he does not recall sitting down with DRB's sales representative and reviewing the contract line by line or page by page.  Mr. Kucharek stated none of the provisions of the contract were explained or paraphrased, including the paragraphs regarding the $28,500 credit he received or the arbitration provision.  However, Mr. Kucharek also admitted that he cannot recall what the sales representative said to him in February 2006.  After signing the contract, Plaintiffs left the trailer site and visited another location with more color selections and options on display.

Mr. Kucharek testified that he had no knowledge of the word arbitration and that he did not know what it meant to be involved in arbitration.  He also stated that on February 24, 2006, the definition of arbitration was not explained to him and the arbitration agreement was never pointed out or explained to him at any time.  However, Mr. Kucharek also testified that he did not read through the arbitration agreement.  Even after he signed the contract and was provided a copy of the document, he never read the contract.  Mr. Kucharek testified that they had an opportunity to read the documents concerning the purchase of their home.  He also testified whenever he had asked

4

DRB's representatives questions, he would receive a courteous answer.

Prior to closing on the home, Plaintiffs made several changes to the home.  On February 24, 2006, Plaintiffs added a wood-burning fireplace, ceiling fans, transom windows, and a double full areaway straight with a slider.  Def.'s Ex. 1, p. 2-3.  On April 1, 2006, Plaintiffs submitted a change order adding a deadbolt lock to their front door, a two foot garage extension, and a vinyl bay with a light single door.  Def.'s Ex. 1, p. 4.

Plaintiffs also completed a walk through of the home an hour before closing on the property.  After the closing, Plaintiffs completed a Settlement Survey regarding their closing experience.  *See* Def.'s Ex. 7.  Plaintiffs rated their overall sales experience with Kellie Wilkinson as "Excellent."[2]  *Id.*  They rated their overall construction experience/quality of their home with "Bear" as "Excellent."  *Id.*  They rated their overall mortgage loan experience with Monocacy Home Mortgage, LLC as "Good."  *Id.*  Finally, they rated their settlement experience with Bowles, Rice, McDavid, Graff & Love as "Excellent."  *Id.*  Mr. Kucharek acknowledged that his wife completed the Settlement Survey and he initialed it.

Mr. Kucharek testified that he has purchased several homes in his lifetime.  He has purchased a total of eight homes.  The purchase of the subject property was actually his second new construction home.  Mr. Kucharek testified that if he selected certain options, he knew he would be overcharged for them because that is essentially what builders do.  He stated that he knew this because he shops around for the best

---

[2] The survey listed Kellie Wilkonson as DRB's sales representative handling Plaintiffs' home.  However, Mr. Kucharek had no recollection of the identity of his sales representative or who Plaintiffs met with on February 24, 2006 to sign the contract.

price.  In constructing this home, Mr. Kucharek contemplated having DRB upgrade his countertops from laminate to corian.  When DRB gave Mr. Kucharek a price for the upgrade, he went to Lowes and Home Depot to receive a quote for their kitchen, and they were cheaper than DRB.  Also, Mr. Kucharek testified that he price shopped closing costs in the area by calling various law firms.

On July 16, 2012, Plaintiffs filed their Complaint in the Circuit Court of Berkeley County, West Virginia.  On July 24, 2012, DRB was served through the West Virginia Secretary of State.  Actual service occurred on DRB on July 27, 2012, when DRB accepted the Summons and Complaint from the West Virginia Secretary of State.  On August 16, 2012, DRB filed a Notice of Removal removing the case to the United States District Court for the Northern District of West Virginia at Martinsburg.  On August 21, 2012, DRB answered the Complaint raising the existence of the arbitration clause as an affirmative defense.

On September 13, 2012, the parties filed a joint motion to stay pending the outcome of the appeal in *Dan Ryan Builders, Inc. v. Nelson*.  The case was pending before the United States Court of Appeals for the Fourth Circuit and on certified question to the West Virginia Supreme Court of Appeals.  The Court stayed this matter pending the Fourth Circuit's decision because the *Nelson* decision involves the enforceability of the identical arbitration clause at issue in this case.  On November 15, 2012, the West Virginia Supreme Court of Appeals issued its decision.

On January 24, 2013, the parties' filed a Joint Motion to Lift the Stay upon the resolution of the certified question.  On January 29, 2013, the Court entered an Order

6

granting the Joint Motion to Lift Stay.  On March 12, 2013, DRB filed a Motion to

Compel Arbitration.  On March 26, 2013, Plaintiffs filed their response in opposition to

DRB's motion.  On April 3, 2013, DRB filed its reply.  On May 29, 2013, the Court held

an evidentiary hearing in this matter to hear the parties' arguments, listen to testimony,

and receive evidence.  Therefore, this motion is ripe for the Court's review.

## II.  Legal Standard under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") applies to "[a] written provision in any . . .

contract evidencing a transaction involving commerce to settle by arbitration a

controversy thereafter arising out of such contract or transaction, or the refusal to

perform the whole or any part thereof . . . ." **9 U.S.C. § 2**.  The FAA reflects "a liberal

federal policy favoring arbitration agreements."  ***Moses H. Cone Mem'l Hosp. v.***

***Mercury Constr. Corp.***, 460 U.S. 1, 24, 103 S. Ct. 927 (1983).  This policy is supported

by Congress's view that arbitration constitutes a more efficient dispute resolution

process than litigation. ***Hightower v. GMRI, Inc.***, 272 F.3d 239, 241 (4th Cir. 2001).

Therefore, "due regard must be given to the federal policy favoring arbitration, and

ambiguities as to the scope of the arbitration clause itself resolved in favor of

arbitration."  ***Adkins v. Labor Ready, Inc.***, 303 F.3d 496, 500 (4th Cir. 2002).

A district court also applies "the federal substantive law of arbitrability, which

governs all arbitration agreements encompassed by the FAA." *Id.* (citations omitted).

However, a district court applies ordinary state law principles governing the formation of

contracts, "including principles concerning the 'validity, revocability, or enforceability of

contracts generally.'" ***Muriithi v. Shuttle Exp., Inc.***, 712 F.3d 173, 179 (4th Cir. 2013)

(citations omitted).  Section 2 of the FAA provides that arbitration agreements may be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." **9 U.S.C. § 2**.  "This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ***AT&T Mobility LLC v. Concepcion***, __ U.S. ___, 131 S. Ct. 1740, 1746 (2011) (quoting ***Doctor's Assoc., Inc. v. Casarotto***, 517 U.S. 681, 687, 116 S. Ct. 1652 (1996)).

To compel arbitration under the FAA, the Fourth Circuit held that a moving party must "demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" ***Adkins***, 303 F.3d at 500-01 (quoting ***Whiteside v. Teltech Corp.***, 940 F.2d 99, 102 (4th Cir. 1991)).  "Under the FAA, courts must stay any suit 'referable to arbitration' under an arbitration agreement, where the court has determined that the agreement so provides, and one of the parties has sought to stay the action.'" ***Noohi v. Toll Bros., Inc.***, 708 F.3d 599, 604 (4th Cir. 2013) (citing **9 U.S.C. § 3**).

### III.  Discussion

DRB's motion to compel arbitration is based upon the following arbitration clause contained in the Contract:

**19. ARBITRATION.**

8

(a) Any dispute arising under or pursuant to this Agreement, or in any way related to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by Us, or any agents and/or employees thereof, (with the exception of "Consumer Products" as defined by the Magnuson-Moss Warranty Federal Trade Commission Improvements Act, 15 U.S.C. Section 2301 et seq. and the regulations promulgated thereunder) shall be settled and finally determined by arbitration and not in a court of law, irrespective of whether or not such claim arises prior to or after Settlement hereunder, pursuant to the Construction Industry Arbitration Rules and the Supplementary Procedures for Residential Construction Disputes of the American Arbitration Association ("AAA") then in effect.  Prior to commencing arbitration, the dispute shall first be mediated in accordance with the Construction Industry Mediation Rules of AAA, or another mediation service designated by Us.  The parties hereto specifically acknowledge that they are and shall be bound by arbitration and are barred from initiating any proceeding or action whatsoever in connection with this Agreement.  Notwithstanding anything to the contrary herein contained, in the event You default by failing to settle on the Property within the time required under this Agreement, then We may either (i) commence an arbitration proceeding under this Section 19, or (ii) bring an action for its damages, including reasonable attorneys' fees, as a result of the default in a court having jurisdiction over the Purchaser.  You expressly waive your right to mediation and arbitration in such event.  Each party shall be entitled to full discovery in accordance with the local rules of court in the event that arbitration is invoked under this Section 19.  The provisions of this Section 19 shall survive the execution and delivery of the deed, and shall not be merged therein.

(b) In the event that an action is brought in court under Section 19(a) or for any reason a claim is determined not to be subject to binding arbitration under Section 19(a), then You and Us knowing and voluntarily waive our rights to a trial by jury in any action, proceeding or counterclaim related to this Agreement or the Property, including such actions, proceedings or counterclaims in which You and Us as well as others are parties.

Pl.'s Ex. 1, ¶ 19, [Doc. 28-1].

### A. All Four Elements Exist for Compelling Arbitration

As outlined above, for DRB to compel arbitration it must "demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the

transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" ***Adkins***, 303 F.3d at 500-01 (quoting ***Whiteside***, 940 F.2d at 102).

### 1.  Dispute Exists Between the Parties

The first element is readily satisfied.  DRB identified the existence of a dispute between the parties as Plaintiffs filed suit against DRB in Berkeley County Circuit Court for alleged defects in the construction of their home, including defects in the concrete in the garage and basement and concealment of vandalism in the garage and basement.

### 2.  Written Agreement Includes an Arbitration Provision which Purports to Cover the Dispute

The second element is also satisfied.  The contract between Plaintiffs and DRB contains an arbitration provision at Paragraph 19 that purports to cover the dispute. The Fourth Circuit Court of Appeals recognized that a court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" ***Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.***, 96 F.3d 88, 92 (4th Cir. 1996) (citing ***United Steelworkers of Am. v. Warrior & Gulf Navigation Co.***, 363 U.S. 574, 582-83, 80 S. Ct. 1347, 1353 (1960)).   The arbitration clause is very broad and covers "[a]ny dispute arising under or pursuant to this Agreement, or in any way related to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by [DRB] . . . ."   Pl.'s Ex. 1, ¶ 19.

Plaintiffs' Complaint alleged defects in the workmanship of their home, specifically with the concrete in the basement and the garage.  Plaintiffs also alleged

that DRB knew their garage and basement had been vandalized by its employees or contractors, but concealed the vandalism from Plaintiffs.  Plaintiffs' disputes arise under and pursuant to the contract and are related to their property.  Accordingly, the arbitration provision covers the disputes.

### 3.  Transaction Related to Interstate or Foreign Commerce

Plaintiffs argue that the transaction is not related to interstate commerce.  The United States Supreme Court "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S. Ct. 2037 (2003) (quoting *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-74, 115 S. Ct. 834 (1995)).  The Court noted that "the statute provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause,' therefore, it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce'-that is, 'within the flow of interstate commerce.'" *Id.* (internal quotation marks, citation, and emphasis omitted).

The parties entered into a contract for construction of a home that was built with materials transported in interstate commerce. *See EQT Corp. v. Miller*, Civil Action No. 1:11CV197, 2012 WL 3839417, at *2 (N.D.W. Va. Sept. 5, 2012) (finding agreement related to interstate commerce because "the parties to the [a]greement [were] citizens of two different states and the work performed under the relevant employment relationship involved a product which is largely commercially transported and sold in interstate

commerce.").  Additionally, the agreement affected interstate commerce because the materials utilized in the construction of the Plaintiffs' home traveled through channels of interstate commerce.  Therefore, the contract involved interstate commerce, and the third element is satisfied.

### 4.  Plaintiffs Failed to Arbitrate the Dispute

The final element is also satisfied.  Plaintiffs failed and refused to arbitrate the dispute by filing the suit in the Berkeley County Circuit Court rather than attending arbitration.

### B.  "The Savings Clause": No Adequate Defense Exists to Prevent Enforcement of the Arbitration Clause

Plaintiffs argue that the Court should deny DRB's Motion to Compel Arbitration because the arbitration clause is unconscionable.  Plaintiffs contend that they are unsophisticated consumers and that DRB is a large, sophisticated corporation. Plaintiffs state that they do not have the financial resources necessary to pay for arbitration.  Plaintiffs also argue that the contract provided DRB with a court forum, but did not provide Plaintiffs with a reciprocal remedy. Plaintiffs are not challenging the enforceability of the agreement as a whole; rather, they are challenging the enforceability of the arbitration provision of the agreement, paragraph 19.  *See **Rent-A-Ctr., West, Inc. v. Jackson***, __ U.S. __ 130 S. Ct. 2772, 2778 (2010) (holding that a party's challenge to an arbitration clause is for the district court to consider, but "[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.").

Section 2 of the FAA permits courts to invalidate arbitration agreements using

12

general contract principles. *See* **9 U.S.C. § 2**.  "This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ***AT&T Mobility LLC***, __ U.S. ___, 131 S. Ct. at 1746; *see also* Syl. Pt. 6, ***Brown v. Genesis Healthcare Corp.***, 724 S.E.2d 250 (W. Va. 2011) (***Brown I***) overruled on other grounds by ***Marmet Health Care Ctr., Inc. v. Brown***, __ U.S. __, 132 S. Ct. 1201 (2012) ("Under the [FAA], 9 U.S.C. § 2, a written provision to settle by arbitration a controversy arising out of a contract that evidences a transaction affecting interstate commerce is valid, irrevocable, and enforceable, unless the provision is found to be invalid, revocable, or unenforceable upon a ground that exists at law or in equity for the revocation of any contract.").

On certified question from the Fourth Circuit, the West Virginia Supreme Court of Appeals noted that parties frequently challenge the enforceability of arbitration clauses on the ground that the clauses lack consideration or lack equivalent promises.  ***Dan Ryan Builders, Inc. v. Nelson***, 737 S.E.2d 550, 558 (W. Va. 2012).  The Court held that "the formation of a contract with multiple clauses only requires consideration for the entire contract, and not for each individual clause." *Id.*  Thus, a single clause within a multi-clause contract does not require separate consideration.

However, the West Virginia Supreme Court of Appeals further concluded that "under the doctrine of unconscionability, a trial court may decline to enforce a contract clause—such as an arbitration provision—if the obligations or rights created by the

13

clause unfairly lack mutuality." *Id.*   Therefore, lack of mutuality of obligation in the formation of a contract is "a factor for a court to consider when assessing whether a contract (or provision therein) is unconscionable."  *Id.*

"Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  **Brown v. Genesis Healthcare Corp.**, 729 S.E.2d 217, 226 (W. Va. 2012) ("**Brown II**").  Under West Virginia law, courts "analyze unconscionability in terms of two component parts: procedural unconscionability and substantive unconscionability."  **Nelson**, 737 S.E.2d at 558 (quoting **Brown I,** 724 S.E.2d at 285).  In establishing procedural unconscionability, courts look at "inequities, improprieties, or unfairness in the bargaining process and the formation of the contract, inadequacies that suggest a lack of a real and voluntary meeting of the minds of the parties."  **Nelson**, 737 S.E.2d at 558.  In assessing the substantive unconscionability, a court may look to the "unfairness in the terms of the contract itself, and arises when a contract term is so one-sided that it has an overly harsh effect on the disadvantaged party."  *Id.*  In the substantive unconscionability analysis, lack of mutuality in a contractual obligation is a proper element to consider. *Id.* Therefore, "[i]f a provision creates a disparity in the rights of the contracting parties such that it is one-sided and unreasonably favorable to one party, then a court may find the provision is substantively unconscionable."  *Id.*

### 1.  Procedural Unconscionability

Plaintiffs argue that the contract is procedurally unconscionable for several

14

reasons.  First, Plaintiffs argue the contract was a form document, and they were not

given the option to negotiate the terms, particularly in regards to the arbitration

provision.  Therefore, Plaintiffs state they were faced with a "take it or leave it" contract.

Second, Plaintiffs contend they are unsophisticated consumers as Mr. Kucharek is a

retired auto mechanic and Mrs. Kucharek worked as a data processor.  Plaintiffs argue

"[t]hey are not sophisticated consumers and do not have experience in negotiating

agreements.  DRB is a large sophisticated home builder operating in at least four states.

The inequalities in bargaining power are self-evident."  Pl.'s Resp., p. 8.

Procedural unconscionability requires "gross inadequacy in bargaining power."

***Adkins***, 303 F.3d at 502 (quoting ***Troy Mining Corp. v. Itmann Coal Co.***, 346 S.E.2d

749, 753 (W. Va. 1986)).  The West Virginia Supreme Court of Appeals set forth the

following guidelines for determining procedural unconscionability:

> Procedural unconscionability is concerned with inequities, improprieties, or
> unfairness in the bargaining process and formation of the contract.
> Procedural unconscionability involves a variety of inadequacies that
> results in the lack of a real and voluntary meeting of the minds of the
> parties, considering all the circumstances surrounding the transaction.
> These inadequacies include, but are not limited to, the age, literacy, or
> lack of sophistication of a party; hidden or unduly complex contract terms;
> the adhesive nature of the contract; and the manner and setting in which
> the contract was formed, including whether each party had a reasonable
> opportunity to understand the terms of the contract.

Syl. Pt. 17, ***Brown I***.

"Procedural unconscionability often begins with a contract of adhesion." ***State ex***

***rel. Richmond Am. Homes of W. Va., Inc. v. Sanders***, 717 S.E.2d 909, 921 (W. Va.

2011).  However, "[f]inding that there is an adhesion contract is the beginning point for

analysis, not the end of it; what courts aim at doing is distinguishing good adhesion

15

contracts which should be enforced from bad adhesion contracts which should not." *Id.* (quoting *State ex rel. Dunlap v. Berger*, 567 S.E.2d 265 (W. Va. 2002)).   The West Virginia Supreme Court cautioned that although adhesion contracts include all form contracts submitted by one party on the basis of this or nothing, "[s]ince the bulk of contracts signed in this country, if not every major Western nation, are adhesion contracts, a rule automatically invalidating adhesion contracts would be completely unworkable." *Pingley v. Perfection Plus Turbo-Dry, LLC*, __S.E.2d__, 2013 WL 1788224 (W. Va. Apr. 10, 2013).

*First*, Plaintiffs assert that they were presented with the Agreement of Sale and were not given the option to negotiate the terms of Paragraph 19.  Plaintiffs argue that they were faced with a "take it or leave it" proposition.  Therefore, Plaintiffs contend the Agreement of Sale is an adhesion contract.  West Virginia's Supreme Court of Appeals defines adhesion contracts as "all 'form contracts' submitted by one party on the basis of this or nothing." *State ex rel. Dunlap v. Berger*, 567 S.E.2d at 273 (citations omitted).  However, even if the Agreement of Sale was a contract of adhesion, and Plaintiffs had no ability to negotiate its term, the contract is not automatically rendered unconscionable.  *State ex rel. Clites v. Clawges*, 685 S.E.2d 693, 700 (W. Va. 2009).

The contract is pre-printed with fill-in-the-blank provisions, although there are no fill-in-the-blanks in paragraph 19.  However, there is no evidence that the contract could not be negotiated.  First, the fill-in-the-blank provisions of the contract were for the base price of the home, the option prices, the initial cash deposit amount, the additional cash deposit amount and date to be paid, the amount DRB contributes to closing costs, the

16

credit for using a preferred settlement attorney, the option to use DRB's preferred

settlement attorney or one of the purchaser's own choosing, and a listing of addenda,

including blank spaces to enter any not mentioned in the contract.  This indicates that

the contract was negotiable.  In this case, there are six addenda, including a use

disclosure hand-written into the contract. Pl.'s Ex. 1, p. 6.  The addenda indicate that

additional terms or changes may be made to the contract through the use of an

addendum.  Plaintiffs assert that the contract was one of adhesion and they had no

opportunity to negotiate the contract's terms.  However, there is no indication that

Plaintiffs could not negotiate over paragraph 19, the arbitration provision.  It is clear that

Plaintiffs did not ask questions about the contract, but rather just signed it.  In fact, there

is nothing to suggest to this Court that Plaintiffs attempted to alter or opt-out of the

provision. Therefore, this Court cannot find a "lack of meaningful choice" or "unfairness

in the bargaining process" based upon Plaintiffs' "uncorroborated understanding or

beliefs about the Agreement when [they] took no steps to confirm those

understandings." *EQT Corp.*, Civil Action No. 1:11CV197, 2012 WL 3839417, at *5.

　　　　Additionally, Plaintiffs provide no evidence that there were no meaningful

alternatives to signing the Agreement of Sale with DRB.  Plaintiffs were free to seek the

services of another homebuilder, as DRB is not the only residential builder in operation

in the Berkeley County and Jefferson County areas of West Virginia.  *See Ciampi v.*

*Dan Ryan Builders, Inc.*, Civ. Action No. 3:10-CV-55 (N.D.W. Va. July 15, 2010); *see*

*also Saturn Dist. Corp. v. Williams*, 905 F.2d 719, 727 (4th Cir. 1990) ("[T]he mere

fact that Saturn requires dealers to agree to its arbitration provisions in order to obtain a

17

Saturn dealership does not make its Dealership Agreement non-consensual.  If a dealer does not wish to agree to non-negotiable arbitration provisions, the dealer need not do business with Saturn.").  Mr. Kucharek testified that he and his wife decided to build a home when they did not find any existing construction on the market that they liked. Plaintiffs began to investigate and contact different builders.  Plaintiffs viewed the S&A Homes' model and met with sales agents from S&A Homes in Berkeley County, West Virginia.  However, they ultimately decided on DRB because they preferred DRB's subdivision and lots over S&A Homes' subdivision and lots, mainly because S&A Homes' subdivision was close to railroad tracks and a private airport.  Therefore, Plaintiffs knew of and met with other available builders in the Berkeley County area.

*Second*, Plaintiffs argue that they are unsophisticated consumers and do not have experience in negotiating agreements compared to DRB, a large sophisticated home builder operating in at least four states.  Plaintiffs have received their high school degrees.  Mr. Kucharek graduated from high school, and he has completed some higher education including courses pertaining to the automotive industry and automotive technology.  He worked as an automotive mechanic his whole life, and he specialized in electronics and computer repairs.  He also assisted with teaching classes at Catonsville Community College.  Mr. Kucharek retired in 1999.  Mrs. Kucharek received her G.E.D. Although she has no higher education that the Court is aware of, she worked for twenty years in data processing.  She currently works for the Macy's warehouse in Berkeley County where she fulfills orders.  *Compare **State ex rel. Saylor v. Wilkes***, 613 S.E.2d 914 (W. Va. 2005) (weighing an employee's "tenth grade education" in favor of finding

18

an employee agreement unenforceable).  Although Plaintiffs are of retirement age, Plaintiffs did not allege that their age weighs in favor of finding that they are unsophisticated consumers.  *Compare* **Arnold v. United Cos. Lending Corp.**, 511 S.E.2d 854 (W. Va. 1998) (finding an agreement unconscionable based upon predatory lending because United Lending was a national lending institution and the Arnolds were "an elderly couple living in Lincoln County, West Virginia"), *overruled on other grounds by* **Nelson**, 511 S.E.2d 854.

Mr. Kucharek also has practical experience in the home-buying industry.  Mr. Kucharek has purchased a total of eight homes, including one previous new construction home.  Mr. Kucharek is also a savvy consumer.  He shops around for the best price to make sure he is not being overcharged.  For example, Mr. Kucharek testified that he shopped around when he contemplated upgrading from laminate to corian countertop, and he compared prices at Lowes and Home Depot.  Mr. Kucharek investigated and researched prior to making his decision.

Plaintiffs did not allege that they were illiterate or unable to read the contract. However, Mr. Kucharek testified that he did not read the contract or the arbitration provision contained within it.  Mr. Kucharek testified that Plaintiffs were provided with a copy of the contract after they signed it.  Despite having months to review the contract prior to closing, Plaintiffs did not read it.  Mr. Kucharek testified that he did not ask DRB's representatives any questions regarding the arbitration provision.  He stated, though, that whenever he asked DRB's representatives any questions, he would always receive an answer.

19

Mr. Kucharek testified that when they met with DRB's sales representative to sign the initial contract, the sales representative was late and seemed to be in a hurry. However, Plaintiffs did not allege that this prevented them from reading and reviewing the contract.  Plaintiffs did not allege that, as a result of the sales representative's behavior they were pressured into signing the contract before reading it.   Therefore, Plaintiffs were educated consumers with high school degrees and experience in the home-buying process.  Additionally, Plaintiffs had ample time to read the contract–whether or not they chose to do so.

*Third*, Plaintiffs argue that the arbitration provision was not explained to them or highlighted.  Mr. Kucharek testified that he did not remember how long it took to review the contract, but he thought it may have taken thirty minutes.  Mr. Kucharek also testified that he could not remember reviewing the contract or even sitting down with DRB's sales representative.  Mr. Kucharek stated none of the provisions of the contract were explained or paraphrased, including the arbitration provision.  Then, Mr. Kucharek admitted he could not recall what, if anything, was said by the sales agent.  It is clear that Mr. Kucharek could not remember what occurred at the sales meeting.  Although Mr. Kucharek contends that no one explained the contract provisions with him, "such explanations are not required by West Virginia law in order to make a negotiating process fair."  *EQT Corp.*, 2012 WL 3839417, at *6 (citing *Adkins v. Labor Ready, Inc.*, 185 F. Supp. 2d 628, 638 (S.D.W. Va. 2001) *aff'd at* 303 F.3d 496 (4th Cir. 2002) ("*Adkins I*") ("There is no requirement that the more sophisticated party to a contract offer the less sophisticated party an oral explanation of the terms of the contract.")).

The arbitration provision was not hidden in a lengthy contract.  The contract was relatively short–seven pages plus six pages of addenda.  On page 6, the page including the arbitration provision, the heading is clearly marked in bold typeface and all capital letters: **19.  ARBITRATION**.  Additionally, Plaintiffs initialed almost directly below the arbitration provision.  Mr. Kucharek testified that he did not read the contract, even though Plaintiffs specifically acknowledged when they signed the contract that they had read it and understood its provisions.  This provision was obvious because it was in all capital letters directly above the signature line on the last page.

Also, the arbitration provision in the contract briefly explained the process to the parties.  First, the provision explained that any claims arising from the contract or by virtue of alleged representations "shall be settled and finally determined by arbitration and not in a court of law."  Second, the provision stated that before "commencing arbitration, the dispute shall first be mediated."  This highlighted that mediation and arbitration are two different processes.  Last, the provision stated that the parties "specifically acknowledge that they are and shall be bound by arbitration and are barred from initiating any proceeding or action whatsoever in connection with this Agreement."  This emphasized that arbitration is a binding process, and that parties are prohibited from initiating other proceedings or actions.  Therefore, the arbitration provision in the contract provided some explanation of the process.

In viewing all the circumstances, Plaintiffs have failed to demonstrate a gross inadequacy in bargaining power suggesting a lack of real and voluntary meeting of minds.  Plaintiffs' age, literacy, education, the lack of hidden or unduly complex terms in the contract, and the manner and setting of executing the contract demonstrate that

Plaintiffs had a reasonable opportunity to read and understand the terms of the contract. Therefore, in light of all the facts, the Court does not find the contract was procedurally unconscionable.  Although West Virginia law requires a finding of "both 'gross inadequacy in bargaining power' and 'terms unreasonably favorable to the stronger party,'" this Court will also explain why it does not find substantive unconscionability. ***Adkins***, 303 F.3d at 502 (quoting ***Troy Mining Corp.***, 346 S.E.2d at 753 (internal citations omitted)).

### 2. Substantive Unconscionability

Plaintiffs argue that the arbitration provision is substantively unconscionable because "mutuality of obligation clearly did not exist in the instant case." Pl.'s Resp., p. 8.  The West Virginia Supreme Court of Appeals explained that "[s]ubstantive unconscionability involves unfairness in the contract itself–'overall imbalance, one-sidedness, *laesio enormis*, and the evils of the resulting contract'–and whether a contract term has 'overly harsh or one-sided results' or is 'so one-sided as to lead to absurd results.'" ***Brown I***, 724 S.E.2d at 287 (internal citations omitted).  Courts must focus their inquiry on "whether the [contract] term is one-sided and will have an overly harsh effect on the disadvantaged party. To determine substantive unconscionability, courts have focused on vague matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* (internal citations omitted).

In assessing substantive unconscionability, courts should generally consider "the commercial reasonableness of the contract terms, the purpose and effect of the terms,

22

the allocation of the risks between the parties, and public policy concerns." *Id.* at 288.

"Substantive unconscionability may manifest itself in the form of an agreement requiring

arbitration only for the claims of the weaker party but a choice of forums for the claims

of the stronger party." **Brown II**, 729 S.E.2d at 228.  Therefore, lack of mutuality of

obligation is "a factor for a court to consider when assessing whether a contract (or

provision therein) is unconscionable."  **Nelson**, 737 S.E.2d at 558.

In this case, Plaintiffs' sole argument is that the contract is unconscionable

because it lacks mutuality of obligation.  Paragraph 19 provides:

> [I]n the event You default by failing to settle on the Property within the
> time required under this Agreement, then We may either (I) commence an
> arbitration proceeding under this Section 19, or (ii) bring an action for its
> damages, including reasonable attorneys' fees as a result of the default in
> a court having jurisdiction over the Purchaser.  You expressly waive your
> right to mediation and arbitration in such event.

Pl.'s Ex. 1, ¶ 19.

Plaintiffs characterize the provision as allowing DRB to take Plaintiffs to court on

*any* issue while Plaintiffs must arbitrate any issue.  Upon reviewing the relative

remedies of the parties, the Court finds that the arbitration provision is commercially

reasonable.  Although DRB is permitted to seek a remedy from the courts if Plaintiffs

default, this is a narrow remedy.  Essentially, the only instance when DRB may go to

court rather than arbitration is to enforce the Agreement of Sale and recover damages

in the event of default.  For every other issue arising out of the contract, DRB must go to

arbitration.  *See* **Miller v. Equifirst Corp. of W. Va.**, Civil Action No. 2:00-0335, 2006

WL 2571634, at *11 (S.D.W. Va. Sept. 5, 2006) (finding an agreement was not so one-

sided as to be unconscionable where the lender defendants retained access to a judicial

forum for foreclosure and bankruptcy proceedings, but were required to arbitrate all other claims).

Plaintiffs argue in their response that the holding in ***Arnold v. United Companies Lending Corp.*** should be applied in this case where the West Virginia Supreme Court of Appeals found that an arbitration agreement "entered into as a part of a consumer loan transaction contains a substantial waiver of the borrower's rights, including access to the courts, while preserving the lender's right to a judicial forum . . . is unconscionable and, therefore, void and unenforceable as a matter of law." 511 S.E.2d at 862.  However, ***Arnold*** is easily distinguishable from this case.  In ***Arnold***, Plaintiffs were an elderly couple living in Lincoln County, West Virginia.  A representative from United Lending came to the residence of the elderly couple and completed the loan closing in their own home.  Unlike the plaintiffs in ***Arnold***, the Kuchareks are not elderly or unsophisticated consumers.  Mr. Kucharek is a savvy consumer with experience in the home-buying market.  Additionally, unlike the high pressure sales environment in ***Arnold*** where United Lending's representative came to the plaintiffs home, in this case Mr. Kucharek testified that he had an opportunity and ample time to review the contract in DRB's sales trailer.  Last, in ***Arnold***, the West Virginia Supreme Court of Appeals implied a *per se* rule for invalidating arbitration agreements when the parties may have non-reciprocal obligations.  However, the West Virginia Supreme Court of Appeals overruled Syllabus Point 5 of ***Arnold*** stating "to the extent that Syllabus Point 5 of *Arnold* may be read to be a "matter of law," *per se* rule that targets arbitration provisions for disfavored treatment, the FAA compels us to

24

overrule Syllabus Point 5." **Nelson**, 737 S.E.2d at 560.

Therefore, the contract term is not so one-sided as to have an overly harsh effect on Plaintiffs.  Additionally, this Court, as evidenced by the procedural unconscionability analysis, does not find that there is a gross inadequacy in bargaining power as Plaintiffs are sophisticated consumers with higher levels of education and training.  Taking into account Plaintiffs' bargaining position when reviewing the contract, the Court does not find that the terms unreasonably favor DRB as to make the contract unconscionable.

### IV.  Conclusion

For the reasons stated above, this Court finds that Defendant's Motion to Compel Arbitration [Doc. 14] should be, and hereby is, **GRANTED**.  Accordingly, Plaintiffs' claims against Dan Ryan Builders, Inc. are **STAYED** and **SUBMITTED TO ARBITRATION** in accordance with Paragraph 19 of the Agreement of Sale.  The parties are **DIRECTED** to notify this Court forthwith upon the conclusion of the matter.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to all counsel of record herein.

**DATED:** July 3, 2013

GINA M. GROH
UNITED STATES DISTRICT JUDGE

25